# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 14, 2007

Charles R. Fulbruge III
Clerk

No. 04-60962

BARBARA HUSS; RODNEY HUSS,

Plaintiffs-Appellees,

v.

JOHN OVERTON GAYDEN, M.D.;
MEMPHIS OBSTETRICS AND
GYNECOLOGICAL ASSOCIATION PC,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Mississippi

Before HIGGINBOTHAM, DeMOSS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

On its own motion, the United States Court of Appeals for the Fifth Circuit invokes Rule 20 of the Mississippi Rules of Appellate Procedure to certify questions that will be determinative of all or part of this case. A majority of the panel has determined that there are no clear controlling precedents in the decisions of the Mississippi Supreme Court.

TO THE HONORABLE SUPREME COURT OF MISSISSIPPI AND THE HONORABLE JUSTICES THEREOF:

No. 04-60962

The style of the cause is Barbara Huss; Rodney Huss v. John Overton Gayden, M.D.; Memphis Obstetrics and Gynecological Association, PC, pending in the United States Court of Appeals for the Fifth Circuit as cause number 04-60962 on appeal from the United States District Court for the Northern District of Mississippi at Oxford.

I

A divided panel of this court issued an opinion[1] concluding that the medical malpractice claims of Barbara and Rodney Huss were barred, as a matter of law, by the applicable Mississippi two-year statute of limitations, section 15-1-36 of the Mississippi Code.[2] The Husses requested rehearing en banc, a poll was taken, and a majority of the judges in active service and not disqualified did not vote in favor of granting rehearing en banc.[3] That motion was accordingly denied. However, this panel of the Fifth Circuit Court of

---

[1] Huss v. Gayden, 465 F.3d 201 (5th Cir. 2006).

[2] MISS. CODE ANN. § 15-1-36(1), (2). The pertinent parts of section 15-1-36 provide:

(1) For any claim accruing on or before June 30, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.
(2) For any claim accruing on or after July 1, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered, and ... in no event more than seven (7) years after the alleged act, omission or neglect occurred [subject to some exceptions not applicable here].

[3] JUDGE BARKSDALE did not participate.

2

Appeals granted rehearing before the panel. The Mississippi Supreme Court subsequently issued its opinion in Sutherland v. Ritter,[4] and now, a majority of this panel, sua sponte, respectfully requests that the Mississippi Supreme Court accept the following certified question:

> When the alleged negligence is (1) administration of a drug by a physician, or (2) failure to disclose what a reasonable practitioner would have disclosed about the risks of a drug, and experts disagree as to whether the drug caused the plaintiff's injuries, is the date that the alleged act, omission or neglect might, with reasonable diligence, have been first known or discovered by the plaintiff the date her condition or illness is diagnosed by non-defendant physicians or experts, or the date the pertinent facts are available in medical records, or is limitations tolled until one in a series of physicians or other experts the plaintiff consults first tells her that the drug caused her condition or illness?

II

This is a medical malpractice suit against a physician and a professional corporation of physicians alleging negligence in administering the drug Terbutaline to Barbara Huss during her pregnancy and breach of a duty to disclose the risks of administering Terbutaline. The manufacturer of Terbutaline was not sued.

The specific allegations of negligence and breach of the standard of care at trial were administering Terbutaline as a tocolytic (an agent to slow or halt labor contractions), the prescription of a tocolytic without physical examination by a physician, the prescription of any tocolytic when Huss was not in preterm labor, and the continued prescription of Terbutaline for more than four weeks when there was no evidence that Huss was in preterm labor. The plaintiffs also contended that Huss would not have consented to treatment with Terbutaline had she been informed of risks. The alleged failure to monitor Huss closely

---

[4] 959 So.2d 1004 (Miss. 2007).

when her blood pressure began to rise was cited as a breach of the standard of care, as well.

The facts giving rise to the Husses' suit, which was filed June 30, 2000, are that Barbara Huss became the patient of Dr. Andrea Giddens, a member of Memphis Obstetrics and Gynecological Association PC (Memphis OB/GYN), on February 17, 1998. At that time, Huss was twenty-seven weeks pregnant. Huss informed Dr. Giddens of her relevant medical history, which included weight gain of between forty and fifty pounds during pregnancy, continued cigarette smoking throughout pregnancy, one prior childbirth by Cesarean section, three miscarriages, prior ovarian cysts, and the recent diagnosis of diabetes. Dr. Giddens immediately concluded that Huss had a high-risk pregnancy and directed her to cease working for the remainder of her term.

On March 8, 1998, Huss was feeling increased cramping and pressure and sought treatment from Memphis OB/GYN. Her contractions were five to ten minutes apart, and she thought she was in labor. Memphis OB/GYN's on-call physician, Dr. John Albritton, attempted to stop the contractions and avoid premature childbirth. He did not personally see Huss, but communicated by telephone with a nurse, first ordering intravenous hydration and the drug Stadol. When Huss's contractions continued, Dr. Albritton ordered injections of Terbutaline, and the contractions ceased.

The next day, March 9, 1998, a third Memphis OB/GYN physician, Dr. John Gayden, treated Huss and also administered Terbutaline. The following day, Huss was examined by Dr. Giddens, her principal attending physician at Memphis OB/GYN. Dr. Giddens prescribed oral Terbutaline for Huss, which was to be taken daily for several weeks. From March 8, 1998 until her child was delivered in May, Huss experienced various symptoms that caused her to seek emergency treatment on numerous occasions. Although hotly disputed by the defendants at trial, Huss, members of her family, and an acquaintance testified

that she experienced severe shortness of breath well before the birth of her child. Huss testified that for two and one-half to three months before delivery, she had severe shortness of breath. On March 20, she was placed on oxygen by an emergency team that transported her to a hospital, and Huss testified that in the weeks before giving birth to her child, her shortness of breath worsened to the point that she was "gasping for breath every other word" and slept sitting up. Huss continued to see Dr. Giddens, and as late as April 21, 1998, Huss was taking Terbutaline and had not been instructed to stop. Huss's medical records reflect the dates and dosages of Terbutaline administered by the defendants.

By May 5, 1998, Huss had experienced high blood pressure and swelling in her legs, and on that date, her physical condition was such that an attempt to induce delivery was made but was unsuccessful. The next day, May 6, 1998, a Caesarean section was performed, and Huss delivered a healthy daughter. Huss was discharged from the hospital May 9, 1998. Her various medical records through that date detailed the administration of Terbutaline and her extensive symptoms and medical history from February 1998, through this discharge, with the exception of her complaints of severe shortness of breath.

After returning home the day of her discharge, Huss continued to experience shortness of breath. She took one of the Terbutaline pills she had "left over" from her prescription because she understood that it was given to asthma patients, and she was concerned about her shortness of breath. At some point during the evening, when she leaned back, she could not breathe. She was taken to the emergency room of Methodist South, a facility that is not a defendant and is not affiliated with any defendant.

It was the following day, May 10, 1998, that Huss was first diagnosed, by three physicians, with cardiomyopathy, pulmonary edema, and congestive heart failure. On that day, an ER physician, who is not a defendant in this case, and Dr. Albritton, who was a member of Memphis OB/GYN, saw her at Methodist

South and each diagnosed Huss's conditions. Dr. Albritton requested that Huss be transferred to Methodist Hospital in Germantown (also not a defendant) and that Dr. McDonald, a cardiologist, consult with her, which he did. That same day, May 10, 1998, Dr. McDonald diagnosed Huss as having cardiomyopathy and congestive heart failure. Her medical records from these admissions reflect her severe shortness of breath and her statement that she had been complaining of shortness of breath for the last three months. Neither the ER physician nor Dr. McDonald were sued by the Husses, and neither physician was affiliated with any of the defendants in this suit. Accordingly, on May 10, 1998, Huss was diagnosed with the conditions of which she now complains by two different non-defendant physicians at a non-defendant medical facility.

Huss continued to see Dr. McDonald as her treating cardiologist through the fall of 1998. In October of that year, he released her to return to light work. Huss testified that she felt worse after this and that her grandparents referred her to another cardiologist, Dr. Murray, with whom she consulted in November 1998. He concurred in the diagnosis of cardiomyopathy and continued to treat Huss through the time of trial. There is no indication that Huss asked any of the physicians who treated her on and after May 10, 1998, if the course of treatment by the defendants or the administration of Terbutaline had been substandard or negligent.

In June 1999, Huss and her husband, Rodney Huss, sued Dr. Giddens for medical malpractice. Dr. Giddens was Barbara Huss's primary treating physician at Memphis OB/GYN until the delivery of her child and Huss's discharge from the hospital following that delivery in May 1998. The suit against Giddens was dismissed on jurisdictional grounds.

Huss testified that it was not until "shortly" or "less than a year" before the present suit was filed on June 30, 2000, that she became aware that her medical records had been reviewed by experts and that those experts had

concluded that the administration of Terbutaline and the course of treatment by the defendants constituted negligence and caused or contributed to her cardiomyopathy, pulmonary edema, and congestive heart failure. She did not explain why or how she obtained these expert opinions or why she did not or could not have obtained them earlier.

The jury heard conflicting evidence regarding the standard of care and whether it was breached. The plaintiffs presented evidence that although Terbutaline is used "off label" by obstetricians to slow or halt contractions, it should not be used when the cervix has not dilated and there is no preterm labor, and that it should not have been administered for four weeks. Plaintiffs' primary causation expert testified that most idiopathic peripartum cardiomyopathies occur after delivery, although some will occur up to about a month prior to delivery. He opined that if Huss had experienced shortness of breath out of proportion to what a physician would expect in a late-term pregnancy "beginning a couple of months before [delivery]," such symptoms "moves it less and less from just the idiopathic peripartum cardiomyopathy" and led him to believe Terbutaline caused or contributed to Huss's heart and lung conditions. It was significant to him that the medical records from Huss's readmission in May 1998 reflected her statements that she had suffered from severe shortness of breath for about two months before the birth of her daughter. A defense expert testified that he used Terbutaline for his obstetrical patients, and that this was a common and accepted practice among obstetricians in cases like Huss's. Whether Terbutaline can and did cause Huss's cardiomyopathy was disputed at trial. The jury was instructed on theories of negligence in administering Terbutaline and lack of informed consent. The jury rendered a general verdict finding for Barbara Huss, awarding her $3,500,000, and finding for Rodney Huss, but awarding him no damages. The district court entered judgment on that verdict.

The defendants appealed, contending that (1) the Husses' claims are barred by the statute of limitations, (2) the evidence was insufficient to prove that Terbutaline caused Barbara Huss's injuries, or alternatively the great weight of the evidence was that the drug did not cause her cardiomyopothy, (3) the presiding magistrate judge improperly excluded a defense expert's testimony regarding causation, (4) there were errors in the jury charge, (5) the judge made prejudicial comments before the jury, and (6) the judge failed to correct a mischaracterization of the evidence during the plaintiffs' closing argument.

Resolution of the statute of limitations issue was potentially dispositive. Accordingly, this Fifth Circuit panel addressed that issue, and a majority of the panel has held that the Husses' claims are barred by limitations and that the defendants are entitled to rendition of judgment in their favor.[5] Judge Higginbotham dissented, concluding that limitations did not bar the claims.[6] As noted above, and as will be considered in more detail below, we are certifying an issue regarding limitations for resolution by the Mississippi Supreme Court in light of the uncertainty as to Mississippi law.

### III

A majority of the panel has determined that the limitations issue was not waived and is properly before the Fifth Circuit as a procedural matter.[7] We adhere to that determination and seek guidance from the Mississippi Supreme Court on the substantive law of Mississippi. However, an observation regarding the dissent's suggestion that the defendants did not present a statute of limitations defense at trial is in order.

---

[5] See Huss v. Gayden, 465 F.3d 201, 208-09 (5th Cir. 2006).

[6] Id. at 209-11 (HIGGINBOTHAM, J., dissenting).

[7] See id. at 204-05.

While it is correct that the defendants did not request that the limitations issue be submitted to the jury, the defendants raised limitations as an affirmative defense in their pleadings, it was listed in the pre-trial order as an issue, the defendants moved for a directed verdict at the close of the Husses' evidence contending that the claims were barred by limitations as a matter of law, and renewed a motion for a directed verdict on that basis at the close of all the evidence. The defendants have maintained on appeal that limitations bars the Husses' claims as a matter of law. They were not required to submit a jury issue to preserve this argument on appeal, and the Fifth Circuit is confronted with a potentially dispositive issue. We seek the guidance of the Mississippi Supreme Court in resolving the merits of that substantive legal issue because we respectfully suggest that the Mississippi Supreme Court's precedent is not clearly controlling. The Mississippi court may conclude that under Mississippi law, limitations has been established as a matter of law, or it may conclude that a fact question exists. A majority of the panel is unwilling to hazard an Erie[8] guess when it appears to us that there is no clearly controlling precedent and a procedure to certify this potentially dispositive issue to the Mississippi Court exists.

The dissent concludes that the defendants "argued causation, that not even the defendant doctors could have known whether Terbutaline caused, or could have caused, Huss's condition"[9] and that the defendants' position that Terbutaline did not cause Huss's condition "entailed the implicit assertion that if the physicians could not have known of any nexus, then Huss, a lay person, certainly could not have known either."[10] The panel majority does not agree that

---

[8] Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

[9] Infra 16.

[10] Infra 27.

9

these statements fully capture the evidence and arguments presented at trial. Nevertheless, the dissent's reasoning highlights the need for guidance regarding Mississippi law. The dissent's view suggests that under Mississippi law, limitations commences to run at a later date in cases in which there was no negligence or no causation. If, in fact, a physician's course of treatment was not negligent or did not cause a patient's condition or illness, the dissent suggests that a patient or claimant could not or should not have known that the course of treatment was negligent. Similarly, defendants who vigorously defend medical malpractice claims would seem to be creating a fact question on limitations, as we understand the dissent's position.

The panel majority has not embraced the dissent's view because it does not seem to give full effect to the statutory directive that suits must be filed "within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered."[11] As discussed below, the panel majority concluded that one who suffers an injury that is not latent is put on notice by that injury that there is a two year period in which to determine if there is a basis for alleging negligence when the course of treatment is known or readily accessible to the claimant and there has been no fraud or concealment by the treating physician on which the claimant reasonably relied. However, it is not clear that the panel's understanding of Mississippi law is correct.

With great respect, we find some tension exists among statements in Sutherland v. Ritter[12] and prior decisions cited therein. The decision in Sutherland states, in what appears to be dicta:

> For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However,

---

[11] MISS. CODE ANN. § 15-1-36(1), (2) (emphasis added).

[12] 959 So.2d 1004 (Miss. 2007).

10

if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.[13]

The decision in Wright v. Quesnel,[14] cited in Sutherland,[15] held that when a plaintiff discovered that her child had died in utero, she should have known there was a causal connection between the treatment she received during her pregnancy (orders to rest in bed on two occasions and her continued discomfort) and the death of her child. The Wright decision said, "When she discovered that her child had died in the womb, Wright should have known that there was some causal connection between the death and Dr. Quesnel's treatment."[16] We note that death within the womb can be due to natural causes or causes other than a treating physician's negligence, and we have difficulty reconciling the holding in Wright with the statement quoted above from Sutherland.

A majority of the Fifth Circuit panel has previously concluded that the Mississippi Supreme Court's decision in Wright was the most analogous to the Husses' case and governed their claims.[17] But the precedential effect of Wright is no longer clear in light of Sutherland.

The Sutherland decision does not discuss Powe v. Byrd, in which Powe's survivors contended that limitations did not commence to run until they received an expert's opinion that a treating physician's negligence may have caused his death.[18] The Mississippi Supreme Court appears to have held that limitations

---

[13] Id. at 1009.

[14] 876 So.2d 362 (Miss. 2004).

[15] 959 So.2d at 1009.

[16] 876 So.2d at 367.

[17] See Huss, 465 F.3d at 206.

[18] 892 So.2d 223, 227-28 (Miss. 2004).

commenced to run when Powe was diagnosed with colon and lung cancer.[19]  The court's decision in PPG Architectural Finishes, Inc. v. Lowery,[20] cited in Sutherland,[21] characterized the holding in Powe as follows: "In Powe, this Court found that a plaintiff's receipt of medical treatment for two years demonstrated that he knew or reasonably should have known about his injuries [and] . . . specifically rejected his claim that the statute of limitations began running when he received an expert opinion because Powe had known of his injury as evinced by the two years of prior medical treatment for the injury."[22]  We are unclear as to whether Powe and the court's characterization of its import in PPG remain precedential.

The majority's opinion in Sutherland does not cite or discuss Barnes v. Singing River Hospital Systems,[23] in which the court construed section 11-46-11(3).[24]  In Barnes, Lisa Barnes was transferred from the defendant hospital, Singing River, on September 23, 1995, after she was diagnosed with numerous serious conditions including sepsis.[25]  Both of her legs, right hand, and most of her left hand were subsequently amputated at another, non-defendant hospital sometime prior to January 9, 1996.[26]  Barnes's attorney received her medical records from Singing River in mid-February 1996, and he informed Singing

---

[19] Id.

[20] 909 So.2d 47 (Miss. 2005).

[21] 959 So.2d 1004, 1009 (Miss. 2007).

[22] 909 So.2d at 51.

[23] 733 So.2d 199, 202 (Miss. 1999).

[24] MISS. CODE ANN. § 11-46-11(3).

[25] Barnes, 733 So.2d at 200.

[26] Id.

River on May 8, 1996 that he believed it was responsible for Barnes' injuries.[27]
The court held that limitations commenced to run on May 8, 1996, reasoning:

> While the Barneses may have been aware of Lisa's injuries before
> the one year time limit was up, they could not reasonably have
> known that Singing River was responsible for those injuries until
> their medical expert notified them of the possible negligence on May
> 8, 1996. We find that the statute of limitations did not begin to run
> until that date. As a result, the Barneses' complaint, filed on March
> 5, 1997, was timely filed within the one-year statute of limitations.[28]

The Sutherland decision does cite Wayne General Hospital v. Hayes, in
which the court held, as a matter of law, that at the time of a child's death, her
parents "had enough information such that they knew or reasonably should have
known that some negligent conduct had occurred, even if they did not know with
certainty that the conduct was negligent as a matter of law" because the death
certificate included sepsis as one of the causes of death.[29] The court explained
in Wayne, "[i]t should have been apparent to the plaintiffs that some negligent
conduct had occurred" even if they did not know what that conduct was.[30]

However, in Neglen v. Breazeale,[31] the court indicated that a plaintiff may
rely on a treating physician's expertise and guidance, and therefore, limitations
was tolled for the more than two years it took the plaintiff to request medical
records:

> A layperson undergoing a surgical procedure trusts in and relies on
> the instructions, professional expertise and guidance of his or her
> physician. Dr. Neglen and/or Dr. Ragu told Lillian that the
> complications arising from James' surgery were ordinary risks that

---

[27] Id.

[28] Id. at 206.

[29] 868 So.2d 997, 1001 (Miss. 2004).

[30] Id.

[31] 945 So.2d 988 (Miss. 2006).

accompany any surgery. This statement raises a question of fact as to when the alleged negligence could have been discovered because, in fact, the two doctors were required to inflate artificially James' blood vessels to insert the graft. Also, a question of fact exists as to whether the doctors should have abandoned the procedure when they determined that James' blood vessels were brittle. This information was not given to Lillian. Under these circumstances, we cannot conclude as a matter of law that Lillian did not act diligently by trusting the doctors' opinions and waiting over two years before requesting James' medical records.[32]

We have difficulty reconciling these and other Mississippi court decisions, notwithstanding statements contained in Sutherland. In the present case, the Husses contend that the defendants breached standards of care in initially administering or in continuing to administer Terbutaline, and in failing to inform Barbara Huss of risks associated with Terbutaline. Barbara Huss was last treated by a defendant on May 10, 1998, and on that date, she was diagnosed by physicians unaffiliated with any defendant as having conditions and illnesses she contends were caused by Terbutaline. Her medical records reflected the course of her treatment and her symptoms. We are unclear which of the Mississippi Supreme Court decisions control a case such as this.

In certifying the limitations question, and in our discussion of that question, we disclaim any intention or desire that the Supreme Court of Mississippi confine its reply to the precise form or scope of the questions certified. The record of this case, together with copies of the parties' briefs, is transmitted herewith.

---

[32] Id. at 991.

14

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

In asking the Mississippi Supreme Court to answer how the discovery rule under Miss. Code. Ann. § 15-1-36 applies to the facts of this case, the majority states that there is confusion as to "which of the Mississippi Supreme Court decisions control a case such as this."[1] I agree that something is amiss, but it is not in the statute we have been asked to apply or in the decisions of the Mississippi Supreme Court.

The history of the statute of limitations defense defendants advance before this court is important. "The defendants' statute-of-limitations defense was not included as a contested legal or fact issue [in the pretrial order]," it appeared in the order only under the heading "additional matters to aid in the disposition of [the case]."[2] The defendants requested no jury instruction regarding limitations and did not argue before the jury that the Husses had sufficient knowledge to trigger the running the statute of limitations; rather, they argued causation, that not even the defendant doctors could have known whether Terbutaline caused, or could have caused, Huss's condition – an idiopathic phenomenon. As the magistrate judge noted in rejecting defendants' post-judgment motion, which raised the statute of limitations defense, "'[the] defendants failed to establish the approximate date on which the statute of limitations began to run' because 'there was no proof of the date by which plaintiff knew or should have known [that Terbutaline was probably the cause of her injury and that her physicians should not have given her the drug].'"[3] Having chosen not to pursue the statute of limitations at trial and, therefore, having failed to develop evidence on the defense, defendants make the tendentious request that this court conclude as a

---

[1] To be clear, the decision to certify the question was made months before the Mississippi Supreme Court decided Sutherland v. Ritter, 959 So.2d 1004 (Miss. 2007).

[2] Huss v. Gayden, 465 F.3d 201, 204 (5th Cir. 2006).

[3] Id.

matter of law that the defense, which is by its very nature a fact driven inquiry, bars Huss's claim.  I respectfully dissent.

I

As an initial matter, I note that certification is simply not appropriate for two reasons.  Mississippi Rule of Appellate Procedure 20(a) explains that certification is available when "it shall appear . . . to any United States Court of Appeals that there may be involved in any proceeding before it questions or propositions of law of this state which are determinative of all or part of that cause and there are no clear controlling precedents in the decisions of the Mississippi Supreme Court . . . ."

First, Rule 20 suggests that it is appropriately invoked when Mississippi law is unclear, and not when a United States Court of Appeals simply wishes to have the Mississippi Supreme Court apply the law to a set of facts for it.  As the Mississippi Supreme Court explained, "Rule 20(a) is thus subject to the discretion of the Court, and, although this Court generally strives to limit our inquiry to issues of law, we have clearly done otherwise in the past."[4]

Indeed, I find this situation parallel to that in Boardman v. United Services Automobile Association, where the Mississippi Supreme Court chided this court for certifying questions that the court considered to be "in the nature of law application questions": "Though subscribing to no theory of mechanical jurisprudence, we would think it ordinarily within the competence of a federal judge, given stipulated facts and eight decisions of this Court declaring and refining the applicable legal principles, to decide the case substantially the same, so far as legal rules determine the outcome of a litigation, as would the appropriate state court."[5]  As I understand this case, the issue before this court

---

[4] McIntyre v. Farrel Corp., 680 So.2d 858, 860 (Miss. 1996) (emphasis added).

[5] 470 So.2d 1024, 1030-31 (Miss. 1985).

is applying law to facts, and I would not shift that task to the Mississippi Supreme Court.

Second, Rule 20(a) states that certification is not available unless "there are no controlling precedents in the decisions of the Mississippi Supreme Court." There is controlling precedent here, and as discussed below, I find no ambiguity in the case law that warrants certification.

## II

We are called upon to "apply[] the unambiguous language of Miss. Code. Ann. § 15-1-36(2),"[6] which provides, in pertinent part, that the statute of limitations in Mississippi for medical malpractice claims runs "from the date the alleged act, omission, or neglect shall or with reasonable diligence might have been first known or discovered." The Mississippi Supreme Court described how the statute's discovery rule operates in Sutherland v. Ritter:

> Thus, in medical negligence cases, we must focus our inquiry on when a plaintiff, exercising reasonable diligence, should have first discovered the negligence, rather than the injury. . . . Furthermore, in the medical malpractice context, the discovery rule may apply in cases where the injury is not latent at all, but where the negligence which caused the known injury is unknown. For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However, if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.[7]

As Sutherland makes clear, the application of the discovery rule is necessarily a case-by-case factual determination – a conclusion fully consistent with the Mississippi Supreme Court's earlier cases.

A reading of the case law discussed by the panel majority leads to the rather unremarkable conclusion that the facts of each case were different and,

---

[6] Sutherland, 959 So.2d at 1008.

[7] Id. at 1008-09.

therefore, the statute of limitations began to run at different times. Sutherland says nothing different; it purports only to resolve confusion as to whether the statute of limitations is triggered by actual or presumptive knowledge of (1) just the injury or, (2) the injury, professional negligence, and causal connection between the two. Sutherland and the other case law reflect that all three factors are involved when applying the discovery rule: when the patient knew or should have known of the injury, the cause of the injury, and the relationship between the injury and the cause, as guided by an overarching reasonableness standard.[8] I describe the facts in each case at some length to dispel the notion that they are in tension.

The Mississippi Supreme Court addressed the discovery rule under the Mississippi Tort Claims Act (MTCA) in Wright v. Quesnel.[9] The discovery rule under the MTCA operates in all parts pertinent like the statute here. The plaintiff was pregnant, and during the eighth month of pregnancy, twice visited a doctor within a week, presenting high blood pressure and symptoms of pre-eclampsia. Both times the doctor merely ordered bed rest. Six days after the first visit, she again went to the doctor with severe pain. The baby had died in utero. On these facts, the court concluded that the plaintiff "had enough information at the time of death such that she knew or reasonably should have known that negligence had occurred."[10] The court specifically pointed out that "Wright did not offer any evidence that she could not have discovered the injury

---

[8] See, e.g., Neglen v. Breazeale, 945 So.2d 988, 990 (Miss. 2006) ("In other words, statute of limitations begins to run when the patient can reasonably be held to have knowledge of the injury itself, the cause of the injury, and the causative relationship between the injury and the conduct of the medical practitioner."). There is some question, discussed infra note 28, as to whether Sutherland requires an exclusive focus on discovery of the negligence; however, that question is not implicated here.

[9] 876 So.2d 362 (Miss. 2004).

[10] Id. at 367.

within the applicable statute of limitations."[11] This is a straightforward conclusion based on the facts: a patient complains of the same symptoms to a doctor on multiple occasions within a week, the doctor orders no treatment, and the patient in a short time experiences an adverse outcome related to the symptoms she presented. A reasonable person would not need an expert to connect the injury, the negligence, and the relationship between the two.

Powe v. Byrd presents a similar situation, although under § 15-1-36.[12] The decedent had for two years received treatment from his doctor for gastritis and hemorrhoids. As it turned out, he had cancer in his colon and lungs. However, it took the plaintiff more than two years after the decedent's cancer diagnosis to file a malpractice claim. The plaintiff argued that she could not have known of the negligence until she received an expert's opinion. The court found that argument to be "disingenuous and without merit."[13] It is a rather unsurprising conclusion that the plaintiff did not need an expert report to suspect physician error when, after the decedent received the wrong diagnosis and treatment for years, it turned out he had colon cancer and not hemorrhoids. Once again, the adverse outcome was directly related to the symptoms the patient presented with and the mistreatment by the physician.

The dictum in PPG Architectural Finishes Inc. v. Lowery describing Powe is consistent.[14] The court explained that the plaintiff in Powe did not need an expert to tell her there was a problem. To the extent that PPG discusses the injury and not the negligence, the statute of limitations at issue in PPG is

---

[11] Id. (emphasis added).

[12] 892 So.2d 223 (Miss. 2004).

[13] Id. at 228.

[14] 909 So.2d 47 (Miss. 2005).

Mississippi's residual statute of limitations, § 15-1-49, which focuses on latent injuries and not negligence.

Nor does Barnes v. Singing River Hospital Systems create tension.[15] The plaintiff had been diagnosed as having rheumatoid arthritis and received treatment beginning in 1989. In August 1995, the plaintiff went to her doctor and complained of pain and swelling in her knee – a symptom ostensibly consistent with rheumatoid arthritis. Nine days later, she went to the hospital and complained of fever, vomiting, and pain in her right elbow. She was diagnosed with acute bronchitis, gastritis with dehydration, and a fractured right elbow – again, what appears to be a plausible diagnosis – and discharged. However, the plaintiff had sepsis, a serious infection;[16] she eventually had to have multiple amputations. The Mississippi Supreme Court concluded that "[w]hile the Barneses may have been aware of Lisa's injuries before the one year time limit was up, they could not reasonably have known that Singing River was responsible for those injuries until their medical expert notified them of the possible negligence."[17] This was a case where, even though there was an obvious injury, the negligence that caused the injury was not necessarily obvious. There was no facially obvious connection between the injury and the error, or the relationship between the two. This is the type of situation that Sutherland clarifies when it explains that the discovery rule covers cases of known injury but unknown negligence.

---

[15] 733 So.2d 199 (Miss. 1999).

[16] See Lawson v. Dallas County, 112 F. Supp. 2d 616, 622 n.11 (N.D. Tex. 2000) ("Sepsis is a systemic blood infection in which pathogens and poisonous products infect the blood stream."). According to Stedman's Medical Dictionary, 28th ed., sepsis is "[t]he presence of various pathogenic organisms, or their toxins, in the blood or tissue."

[17] Barnes, 733 So.2d at 206.

The panel majority's discussion of Wayne General Hospital v. Hayes[18] creates some tension, but the case itself does not. The decedent was originally admitted to the hospital for observation for pneumonia; however, her condition worsened and she was transferred to another hospital. Once there, her doctors determined that she needed peritoneal dialysis. During that procedure, the doctor perforated the decedent's bowels, which resulted in peritonitis. She developed a serious blood infection. She was then transferred to another hospital, but eventually died. Her death certificate listed cardiomyopathy, congestive heart failure, and sepsis as causes of death. The court concluded that the plaintiffs should have known of the negligence by the time of the decedent's death:

> Moreover, the plaintiffs, at the time of [decedent's] death, had enough information such that they knew or reasonably should have known that some negligent conduct had occurred, even if they did not know with certainty that the conduct was negligent as a matter of law. Since the death certificate included sepsis as one of the causes of death, it should have been apparent to the plaintiffs that some negligent conduct had occurred. Additionally, [decedent] was hospitalized at Arkansas Children's Hospital subsequent to the bowel perforation which allegedly occurred at the University of Mississippi Medical Center. This should have alerted her survivors of possible problems with her medical treatment.[19]

It is not hard to see why the court concluded that plaintiffs knew or should have known of the negligence: they knew that a surgical procedure had punctured the decedent's bowel; that she developed peritonitis; that she developed a blood infection; and that she then had to be transferred to another hospital. Her death certificate listed sepsis – a serious infection generally in the blood stream[20] – as

---

[18] 868 So.2d 997 (Miss. 2004).

[19] Id. at 1001.

[20] See supra note 16.

a cause of death. That is a direct chain of events – similar to Wright and Powe – where the causal connection between the alleged negligence and injury was reasonably apparent.

In Neglen v. Breazeale the decedent entered the hospital with an abdominal aortic aneurysm, and he underwent surgery during which "the affected blood vessel is replaced with a graft made of synthetic material."[21] However, following surgery, decedent complained of severe abdominal pain and experienced post-surgical bleeding. The decedent was bleeding extensively from the graft, and, after spending three days on a ventilator, died. The Mississippi Supreme Court held that summary judgment on the statute of limitations question was not appropriate "since questions of fact exist[ed]."[22] The decedent's doctors had misinformed the plaintiff about some issues and did not tell her about other issues concerning what happened. Considering the doctors' role in shaping the information the plaintiff knew, the court could not conclude as a matter of law on the record before it that plaintiff acted unreasonably in relying on what the doctors told her and waiting to pursue her claims.

Finally, in Sutherland, the plaintiff complained that his doctor committed malpractice by prescribing Zyprexa. Sutherland developed a number of side effects, and decided to stop taking the drug without consulting his doctor. However, he resumed taking it, and eventually checked himself into the hospital. In his deposition, Sutherland stated that he checked himself in because, he said, "Zyprexa was destroying my life."[23] When asked if he believed Zyprexa was the cause of his problems, Sutherland answered that "[i]t was not a belief, it was

---

[21] 945 So.2d at 989.

[22] Id. at 991 (emphasis added).

[23] 959 So.2d at 1006.

22

knowing."[24]  When he was discharged from hospital, his discharge summary stated that "the Zyprexa has been discontinued and the patient reports that he feels less flat and 'zombie' like."[25]  He later told another doctor that Zyprexa had "caused a lot of bad side effects."[26]  That doctor diagnosed Sutherland's condition as Tardive Dyskinesia Syndrome (TDS).  Sutherland stopped taking Zyprexa in April 2001, but did not file his claim until January 2004.

Sutherland argued that his claim was not time-barred under § 15-1-36, as he had a "latent injury," and that he did not know he had TDS until January 2002.  The Mississippi Supreme Court found Sutherland's argument unavailing: "By his own admission, Sutherland knew who, when, how, and by what he had been injured soon after receiving treatment and the Zyprexa prescription from Dr. Ritter, and certainly, no later than the date of his discharge from St. Dominic.  Considering Sutherland's action, we conclude that Sutherland knew that Dr. Ritter's prescribing him Zyprexa had caused him to suffer an injury."[27]  To recapitulate the circumstances in Sutherland: the plaintiff admitted knowing that the drug prescribed by his doctor was the source of the injury of which he complained.  He knew of the injury, the alleged negligence, and the causal connection between the two.  He did not need to know the name of his condition to know those things, much like the plaintiffs in Wright and Powe did not need experts to alert them to the possibility of negligence.

I highlight that Sutherland does not cast doubt on Wright, the case the panel majority "previously concluded . . . was the most analogous to the Husses' case and governed their claims."  In both cases, the Mississippi Supreme Court

---

[24] Id.

[25] Id.

[26] Id.

[27] Id. at 1009.

simply held that the plaintiff had enough information to know of the injury, the alleged negligence, and the causal connection. Admittedly, the conclusion in Wright was circumstantial and inferential, while plaintiff's knowledge in Sutherland was direct; but that alone cannot cause "the precedential effect of Wright [to] no longer [be] clear." In both cases it was clear that the plaintiff knew or reasonably should have known of the injury, negligence, and causal relationship between the two.

In short, all of these cases flow naturally from the design of Mississippi's discovery rule: it is a fact intensive, three-element inquiry. In some instances the negligence is quite obvious, in others not so. Facial similarities – such as sepsis being involved in both Barnes and Hayes – create the appearance of inconsistency when results differ, but the truth is that those similarities belie greater differences that a careful examination of the facts in each case reveals. These cases all turn on questions relating to what the plaintiff knew and when. The Mississippi Supreme Court's decision in Sutherland, even to the extent it may create other problems, says nothing different.[28]


III

If anything, Sutherland adds clarity to this case, as it addresses the exact issue here: when Huss should have known that the doctors' negligence caused

---

[28] As the Sutherland dissent points out, the majority's focus on knowledge of the negligence rather than the injury suggests that the statute of limitations would start to run against a plaintiff who knows a doctor erred but is unaware that the error caused any injury. See id. at 1010-11 (Diaz, J., dissenting); see also Jackson Clinic for Women, P.A. et al. v. Henley, Nos. 2005-IA01833-SCT, 1999-IA-01286-SC, 2007 WL 2265136, at * 8 (Miss. Aug. 9, 2007) (Diaz, J., concurring in the judgment). This is in tension with the black letter principle that no cause in tort lies where the plaintiff does not have an injury. This criticism of Sutherland, however, does not apply here: Huss knew of the heart condition but the purported negligence and causal connection to the injury were not obvious. In other words, this is not a case where the plaintiff knew only of the negligence but not the injury.

her injury. Moreover, Sutherland lends support to my earlier dissent.[29] The Husses' situation falls precisely into the hypothetical described in Sutherland – a person who knows that he is ill or injured, but is unaware of any negligence, much less any connection between the negligence and injury:

> Furthermore, in the medical malpractice context, the discovery rule may apply in cases where the injury is not latent at all, but where the negligence which caused the known injury is unknown. For instance, a patient who undergoes a medical procedure may develop serious complications which are clearly known. However, if the patient has no reason to know that the doctor's negligence in performing the procedure caused the complications, the discovery rule will apply, even though the injury itself is not latent at all.[30]

Huss, who was pregnant, went to her doctor complaining of cramping, pressure, and contractions; when the first attempts at treating her contractions failed, her doctor ordered that she be given Terbutaline. Her contractions stopped, and her doctors ordered that she continue to take Terbutaline. The injuries that Huss suffered, however, were not pregnancy related; rather, the injuries were cardiomyopathy, pulmonary edema, and congestive heart failure. Other than the sequence of events – pregnancy complications, treatment, diagnosis of injury – there was nothing to clue Huss into the source of her injury. Indeed, these types of ailments could have been naturally occurring or could have resulted from life-style choices.[31]

This case thus differs from those like Wright, Powe, and Wayne where there was a direct injury-negligence-causation nexus. Nor is this case factually

---

[29] See Huss, 465 F.3d at 209-11 (Higginbotham, J., dissenting).

[30] 959 So.2d at 1008-09 (emphasis added).

[31] For example, Stedman's Medical Dictionary lists five types of cadiomyopathy and multiple etiologies for each. The etiologies include familial/genetic, idiopathic, alcohol, and toxic substances.

similar to Sutherland where the plaintiff admitted knowing "who, when, how, and by what he had been injured."[32]

Of course, what happened is that the defendants faced a choice at trial between different defenses that were facially inconsistent: (1) Huss knew enough of the causal connection between her condition and Terbutaline to trigger the statute of limitations; or (2) there was no causal connection between Huss's condition and Terbutaline, and that the doctors could not know of any connection. To have argued both to the jury would have been awkward to say the least. Rather than do so, the defendants made a tactical choice that arguing causation was the better defense. That entailed the implicit assertion that if the physicians could not have known of any nexus, then Huss, a lay person, certainly could not have known either. They lost, and then came hat in hand to this court. We sit to correct errors made by the courts, not to correct the parties' trial strategies or to impose judicial will – here, medical tort reform – upon a jury in frustration of its fundamental role in governance.

IV

With deference, the error in the question the panel majority certifies is taking from the jury what is quintessentially a fact question – what did the plaintiff know and when – and presenting it to the Mississippi Supreme Court as a question a law. The majority has picked but three from among the many factors from the case here and determined that, as a matter of law, one is, standing on its own, going to be determinative of when the statute of limitations began to run. But the answer to the majority's question is: "It depends." It depends on, inter alia, the sequence of events; how obvious the connection between the negligence and the injury is; what other conditions and illnesses the plaintiff may have; what independent knowledge the plaintiff had; how confident

---

[32] 959 So.2d at 1009.

a diagnosis the plaintiff received; whether the plaintiff received conflicting diagnoses; and what the negligent doctor(s) told or represented to the plaintiff, the credibility of the doctor(s) involved, and the facial plausibility of what the doctor(s) said. Sorting through these types of factual inquiries is not subject to the precise line drawing that the majority's question to the Mississippi Supreme Court suggests. This is not to say that a jury always must decide if and when the statute of limitations began to run; as Sutherland demonstrates there will be occasions when it is clear as a matter of law. This, however, is not such a case.

Even assuming that Sutherland is inconsistent with the Mississippi Supreme Court's other discovery rule case law, certification is still inappropriate. Sutherland is an authoritative explanation of the law; to the extent other cases seem inconsistent, our task is simple: to follow and apply the court's most recent elucidation of the law. The court implied as much when it explained that it was "tak[ing] this opportunity to clarify the law."[33] To these eyes, the Mississippi Supreme Court helpfully described how courts are to approach the factual situation – known injury but unknown negligence and unknown causal connection – that is involved here. To the extent there are inconsistencies, the Mississippi Supreme Court has already told us what we are to do.

With all respect for my colleagues, I must dissent.

---

[33] 959 So.2d at 1007.